**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11 CV 7574 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| SCHNEIDER LOGISTICS, INC., and | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff William Allen sued Schneider Logistics and Wal-Mart, alleging that Defendants' negligence caused the injuries that he suffered on the job as a freight handler at a Wal-Mart distribution center that Schneider Logistics managed and operated. Wal-Mart settled with Plaintiff, (see [52]), but Schneider Logistics, arguing that it owed no duty to Allen, now moves for summary judgment [72]. For the reasons set forth below, the Court denies Schneider Logistics's motion.

**I. Background[1]**

Wal-Mart Stores East, LP ("Wal-Mart") operates a regional distribution network for general merchandise that includes a distribution facility that it owns in Elwood, Illinois. Def. SOF ¶¶ 1, 8. Relevant here, on April 1, 2006, Wal-Mart and Schneider Logistics ("Schneider") entered into a contract, by which Schneider "agree[d] to oversee and manage certain day-to-day operations, including but not limited to, receiving, handling, and shipping of goods, at [Wal-

---

[1] The Court has taken the relevant facts from the parties' Local Rule ("L.R.") 56.1 statements. Where the parties disagree over relevant facts, the Court sets forth the competing versions. In addition, the Court resolves genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

Mart's Elwood, Illinois distribution facility]." Pl. SOF ¶¶ 2-3. Wal-Mart manufactured products overseas, typically shipped them in 20-foot or 40-foot long containers to the United States, and then transported the containers by truck to its distribution centers, such as its Elwood facility. Def. SOF ¶¶ 7-9. The Wal-Mart/Schneider contract tasked Schneider with unloading the containers once they arrived at the facility and then preparing the goods for transport to their next Wal-Mart destination. Def. SOF ¶¶ 23-24. Schneider, however, outsourced the physical unloading of the containers to Plaintiff's employer, Progressive Logistic Services ("Progressive"), which performed its work at Schneider's direction. Def. SOF ¶ 25; Pl. SOF ¶ 20.

In February 2011, at the time of Plaintiff's accident, Schneider's general manager, Jonathan Starr, and thirteen other operations managers, were responsible for all aspects of operating the Elwood facility. Pl. SOF ¶¶ 8, 10. Wal-Mart typically purchased the physical equipment (forklifts, pallets, jacks, etc.) necessary to operate the facility, but usually after discussing these needs with Schneider. Pl. SOF Def. SOF ¶ 7; Pl. Resp. to Def. SOF ¶ 2-3. Just one Wal-Mart employee, Michelle Veneable, worked at the Elwood facility, and she had no safety or oversight responsibilities. Pl. SOF ¶ 6.

Responsible only for overseeing the facility's logistics and operations, Schneider had no input or involvement regarding the contents of the containers that arrived on trucks at the facility or the way in which the containers were filled. Def. SOF ¶ 11. Wal-Mart's overseas manufacturers packed the containers, and, for obvious economic reasons, Wal-Mart expected that these containers would be filled to maximum capacity. Def. SOF ¶¶ 5-6. When a delivery arrived at the Elwood facility, a driver would back the truck's chassis up to the loading dock until it made contact with the dock's rubber bumpers. Def. SOF ¶12. When the truck was flush

with the bumpers, a gap existed between the rest of the truck and the building, the size of which was dictated by the size of the bumpers. Def. SOF ¶14. The parties agree that this gap was typically between 4 and 7 inches at the Elwood facility. Pl. Resp. to Def. SOF ¶ 27. So that a truck can be safely unloaded, a dock plate – which effectively acts as a bridge – is used to fill that gap and connect the loading dock and the container. Pl. Resp. to Def. SOF ¶ 14. But when a container is too full, a dock plate cannot be deployed. Def. SOF ¶18; Pl. SOF ¶15. Because Wal-Mart's trucks were usually filled to capacity, this was often (if not always) the case when a container arrived for unloading at the Elwood facility. Def. SOF ¶17. In fully-packed containers, only 4-6 inches[2] separated the boxed cargo and the end of the container deck. Def. SOF ¶17.

Defendant contends, though Plaintiff disputes, that the standard industry practice for unloading a fully-packed container dictates that an unloader (such as Allen) is to stand on the undeployed dock plate and, without stepping across the gap into the container itself, remove enough product from the container so that the dock plate can be safely deployed before unloading the remainder of the cargo. Pl. Resp. to Def. SOF ¶¶ 20-21. For that reason, Defendants argue, the gap between the dock and the container does not pose a safety hazard to an unloader. Pl. Resp. to Def. SOF ¶ 19. Plaintiff disagrees. Pl. Resp. to Def. SOF ¶ 19.

As an unloader for Progressive at the Elwood facility, Plaintiff was, of course, aware that every container had some gap between the dock and the rear of the truck. Pl. Resp. to Def. SOF ¶ 35. He also knew that a dock plate could not be deployed when an arriving container was full, as was almost always the case. Pl. Resp. to Def. SOF ¶ 36. The parties agree that, prior to the accident at the heart of this lawsuit, "Plaintiff would be as careful as he could until he could get

---

[2] Although Defendant's Statement of Facts states that this space was typically 4 to 6 *feet* (see ¶ 17), Plaintiff's response to Defendant's SOF clarifies that the evidence demonstrates that this space was usually only 4 to 6 *inches* (see Plaintiff's response to ¶ 21).

3

the dock plate deployed." Pl. Resp. to Def. SOF ¶ 36.

On, February 11, 2011, Plaintiff opened the dock door to unload a container. Pl. Resp. to Def. SOF ¶ 38. Because the container was too full to deploy the dock plate, Plaintiff and a colleague began unloading the first wall of boxes, where each box was roughly 2.5-3 feet wide, 2 feet tall, and 2 feet deep. Pl. Resp. to Def. SOF ¶ 39. After removing several boxes, Plaintiff stepped onto the container from the dock, grabbed a box with both hands, rested his chin on top of the box, and turned to his left to step off the container. Pl. Resp. to Def. SOF ¶¶ 40-42. Plaintiff knew that the gap existed, but – focused on the task at hand and with the box obstructing his view – accidentally stepped into the gap with his left foot, resulting in the injuries for which he now seeks to hold Schneider liable. Pl. Resp. to Def. SOF ¶¶ 43-44.

Plaintiff contends that prior to his accident he had "made numerous complaints to [Schneider] employees, including . . . a superintendent, especially about the safety of the trucks being loaded too far to the rear of the containers so that the dock plate could not be deployed." Pl. SOF ¶ 22. In fact, Plaintiff maintains that he complained to Schneider "each time that they could not get the dock plate to deploy." Pl. SOF ¶ 23. In response, he alleges, Schneider employees told him that "that's the way it is" and to "[d]o your job as safely as you can." Pl. SOF ¶ 24. Plaintiff agrees that Schneider personnel "reinforced to all employees that they should be safe in their practices" and "aware of their surroundings while at the facility." Pl. SOF ¶ 25. But Plaintiff also points out that Schneider's own safety handbook states that "dock plates must be in place before trucks are loaded or unloaded." Pl. SOF ¶ 30. And he argues that a "dock board"[3] – essentially a portable version of a dock plate – can be used to bridge a gap between the

---

[3] Schneider objects to Plaintiff's 56.1 statements that relate to dock boards, arguing that this evidence is inadmissible because it lacks a foundation. The Court rejects this argument. At the deposition of Stephen Douglas Francois, Schneider's assistant general manager at the Elwood facility, Francois testified that dock boards are portable, typically steel or aluminum devices that can be used to bridge the gap between

dock and the container in situations where a dock plate cannot be deployed. Pl. SOF ¶ 27. Dock boards, however, were never used at the Elwood facility. Pl. SOF ¶ 28.

Plaintiff sued Wal-Mart and Schneider in the Circuit Court of Cook County on September 14, 2011, alleging that Defendants' negligence – specifically, Defendants' failure to provide a dock plate or a safe alternative – caused Plaintiff to be injured by the gap between the truck and the loading dock. Wal-Mart settled with Plaintiff on February 26, 2013, and, following non-medical fact discovery, Schneider filed the summary judgment motion [72] at issue here.

## II.     Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation omitted). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

---

the loading dock and container when a dock plate cannot be deployed. Defendant argues that the Court should ignore this testimony because there is no evidence that dock boards are "safe and proper devices to bridge the gap." Construing Francois's testimony in the light most favorable to Plaintiff, it can reasonably be inferred that portable dock boards are (safe) alternatives to dock plates, which can be used when a dock plate cannot be safely deployed. That evidence is admissible and therefore appropriate for the Court to consider at summary judgment. If at trial Defendant wishes to cast doubt on the safety and/or efficacy of a dock board, it is of course welcome to do so.

*Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

**III. Analysis**

Plaintiff William Allen is a resident of Illinois. Wisconsin is both Defendant Schneider Logistics's state of incorporation and its principal place of business. Because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, the Court has jurisdiction over this negligence action pursuant to 28 U.S.C. § 1332(a). In diversity cases, the Court applies federal procedural law and state substantive law. See *e.g., Santa's Best Craft, LLC v. St. Paul Fire and Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010). The parties agree that Illinois law applies.

The essential elements of a cause of action based on negligence are: "the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach." *Ward v. K Mart Corp.*, 554 N.E. 223, 226 (Ill. 1990). Schneider argues that summary judgment in its favor is appropriate because it owed no duty to Plaintiff. "Whether a duty exists in a particular case is a question of law to be determined by the court." *Id.*

Schneider places the blame for Plaintiff's injury on Plaintiff's own conduct, arguing that "Plaintiff did not exercise the reasonable level of care for his own safety" and that Plaintiff "fail[ed] to protect himself from an open and obvious condition." See Def. MSJ at 9. However, "the scope of defendant's duty is not defined by reference to plaintiff's negligence or lack thereof. The focus must be on the defendant. A major concern is whether *defendant* could reasonably have foreseen injury to plaintiff." *Ward*, 554 N.E. at 230. For that reason,

6

Defendant's emphasis on Plaintiff's conduct is somewhat misplaced.  The Illinois Supreme Court has explicitly said that to determine the existence of a duty, "[t]he inquiry is whether the defendant should reasonably anticipate injury to those entrants on his premises who are generally exercising reasonable care for their own safety, but who may reasonably be expected to be distracted, as when carrying large bundles, or forgetful of the condition after having momentarily encountered it.  If in fact the entrant was also guilty of negligence contributing to his injury, then that is a proper consideration under comparative negligence principles." *Id.* at 232.  In Illinois, courts examine four factors to determine the existence of a duty in negligence cases: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury, (3) the magnitude of the burden of guarding against it, and (4) the consequences of placing that burden upon the defendant.  *Id.* at 226-27, 232; *Camp v. TNT Logistics Corp.*, 553 F.3d 502, 509 (7th Cir. 2009).

Defendant likens this case to *True v. Greenwood Manor West, Inc.*, 737 N.E.2d 673, 676 (Ill. App. Ct. 4th Dist. 2000), a case in which the plaintiff sued a nursing home for negligence after she tripped on a fan on the floor of her sister's room. In examining the four factors listed above, the Court concluded that the fan – which the plaintiff walked past and acknowledged on her way into the room, but then tripped over just moments later on her way out – was so "open and obvious" that it could not be said that the plaintiff's injury was "reasonably foreseeable" to the defendant nursing home.  *Id.* at 677.  The court rejected Plaintiff's attempted invocation of the "deliberate encounter exception," a doctrine that ascribes a duty to a possessor of land when it is expected that an "invitee will proceed to encounter a known danger because to a reasonable person in his position the advantages of doing so would outweigh the apparent risk." *Id.*  The court observed that the plaintiff did not present any evidence that she made "a deliberate choice to proceed in the face of some danger presented by then fan," but merely claimed that she

7

"inadvertently walked into an object that was plainly visible to anyone exercising ordinary attention and perception." *Id.* Further, the court determined that the defendant had "no reason to expect that [the plaintiff's] attention would be distracted to the extent that she would forget that the fan was there or would fail to protect herself from it." *Id.* 676. The court also concluded that the likelihood of injury was slight "because it is assumed that persons encountering such a condition will appreciate and avoid the risk it presents" and that it would have been impractical for the nursing home staff members to take measures to remove any objects or medical equipment "with which inattentive visitors might collide." *Id.* at 677-78. Defendant argues that these same rationales apply with equal force to Allen. The Court disagrees.

Unlike in *True*, Allen did make a "deliberate choice" to encounter a hazard (the gap). In fact, because of the way in which the containers were packed, Plaintiff's job required him to do so each time a new truck arrived at the facility. Defendant knew this. Defendant attempts to focus the inquiry on Plaintiff's choice to step across the gap instead of simply reaching to grab the boxes from a stationary position on the non-deployed dock plate. But regardless of whether Plaintiff violated industry standard practice by stepping across the gap (a genuine dispute for trial), the Court cannot conclude that Plaintiff's decision to do so, rather than dead lift the boxes from some distance, was not reasonably foreseeable. Unlike in *True*, it could be expected that Plaintiff might reasonably decide that the advantages of stepping across the gap (*i.e.,* faster and easier unloading, increased leverage, etc.) outweighed the apparent risk of falling into a 4''-7'' space. Therefore, *True* is not all that helpful to the Court in assessing the scope of Defendant's duty here. Fortunately, several Illinois decisions with facts more analogous to Allen's case are instructive on that point.

In *Ward*, a K mart customer sued the store for injuries that he sustained by walking into a

8

concrete post just outside the store's exit while carrying a large mirror that he had just purchased inside. 554 N.E. at 224. Although K mart argued that it owed no duty to the plaintiff due to the open and obvious nature of the post (which the plaintiff acknowledged seeing on his way into the store), the Illinois Supreme Court held that "it was reasonably foreseeable that a customer would collide with the post while exiting defendant's store carrying merchandise which could obscure view of the post." *Id.* at 233. The court determined that "defendant had reason to anticipate that customers shopping in the store would, even in the exercise of reasonable care, momentarily forget the presence of the posts which they may have previously encountered by entering through the customer entrance door" and that it was "reasonably foreseeable that a customer carrying a large item which he had purchased in the store might be distracted and fail to see the post upon exiting through the door." *Id.* The foreseeability of the accident, coupled with the "slight" burden of protecting against this danger (by issuing a simple warning or relocating the post), compelled the conclusion that K mart owed the plaintiff a duty as a matter of law. *Id.* at 233-34. The parallels between *Ward* and Allen's case are obvious. Although Plaintiff knew of the gap's existence, he momentarily lost sight of it due to the large box that Defendant knew he would be carrying proximate to the gap. Yet Defendant failed to provide Plaintiff with a dock board – a minimally burdensome alternative, Francois's deposition testimony suggests.

*Courtney v. Allied Filter Engineering, Inc.*, 536 N.E.2d 952, 954 (Ill. App. Ct. 1st Dist. 1989), abrogated on other grounds by *Marchese v. Vincelette*, 633 N.E.2d 877 (Ill. App. Ct. 1st Dist. 1994), also is instructive. *Courtney* involved an injury to a truck driver who, like Plaintiff, fell into a five-inch gap between a loading dock and his truck while unloading a delivery. The driver, upon arriving at his delivery destination and backing his truck against the loading dock's bumpers, was met by uncooperative employees of the defendant company, who refused to help

9

him unload his truck or deploy the dockplate for him. *Id.* Because the driver expected to be assisted at the loading dock, he had not brought his "portable dockplate," which he carried with him only when he expected that he would need it. *Id.* While attempting to unload the truck himself, several boxes fell and struck the driver in his back, causing him to fall knee-first into the gap. *Id.* The driver sued for negligence, and on post-trial motions following a jury award to plaintiff, the trial court ruled that the defendant had not breached any duty owed to plaintiff and that plaintiff assumed the risk. *Id.* at 225-26. On appeal, however, the Illinois Appellate Court reversed that decision, holding that the "evidence amply demonstrate[d] that defendant should have been aware that plaintiff might be distracted or suffer harm when attempting to unload his truck notwithstanding the obvious risk." *Id.* at 228. In other words, even though the gap posed an "open and obvious condition," the defendant had a duty to take reasonable steps to protect the plaintiff from that condition because of the reasonable foreseeability that he may injure himself in spite of its obvious nature.

Applying the four duty factors to the evidence submitted by Plaintiff with these cases and the courts' rationales in mind, the Court concludes that it was reasonably foreseeable that Allen would injure himself in the gap, based on the sheer frequency and proximity with which Plaintiff would have encountered it as an unloader at the Elwood facility. The parties agree that *every* truck was packed so full that the dock plate could not be deployed until the first row of boxes was removed. That means that Plaintiff had to unload boxes across a gap every single time that he unloaded a truck at the Elwood facility. At trial, Plaintiff's intimate familiarity with the gap and the frequency with which he successfully encountered it may speak to his comparative negligence, but as the Illinois Supreme Court has made clear, his own negligence is irrelevant to the threshold issue of Defendant's duty. In spite of the open and obvious nature of the gap and

10

Plaintiff's awareness of it, it was reasonably foreseeable that he would be injured by inadvertently stepping into it. Beyond mere common sense, Plaintiff complained about the gap to Schneider many times. And Schneider's own safety handbook – which specified that dock plates *must* be used before trucks are unloaded – suggests that Schneider, in fact, *did* foresee the danger of unloading a container across the gap.

Additionally, Plaintiff has put forth evidence that suggests that the burden on Defendant in guarding against the gap would be relatively small. Schneider argues that it did not own the facility and that it lacked any ability to control the way in which the containers were packed, such that it would be unreasonable to hold it responsible for the way in which unloaders, like Plaintiff, had to remove the first row of boxes before the dock plate could be deployed. Plaintiff, however, has submitted deposition testimony from Schneider's assistant general manager at the Elwood facility, Stephen Douglas Francois, to the effect that portable "dock boards" can be used to bridge the gap between the truck and loading dock before a dock plate can be deployed. Construing that evidence in the light most favorable to the non-movant and drawing all reasonable inferences in his favor, (see *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491-92 (7th Cir. 2000)), that testimony suggests that the burden on Defendant in guarding against the dangers of the gap would have been minimal. At trial, the totality of the evidence may point in a different direction, but at summary judgment, the evidence before the Court supports that inference.

At trial, Plaintiff will have the burden of proving each element of his negligence claim, including that the relevant factors demonstrate the existence of a duty on the part of Schneider. But in opposing Defendant's summary judgment motion, Plaintiff must "demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [his] favor." *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (internal citations omitted). By

citing persuasive case law and the relevant evidence in the record, Plaintiff has done that here. For that reason, Defendant's motion for summary judgment is denied.

## IV. Conclusion

For these reasons, the Court denies Schneider Logistics's motion for summary judgment [72].

Dated: May 12, 2014

Robert M. Dow, Jr.
United States District Judge